Imboden et al. vs. The Etowah and Battle Branch, etc., Mining Company.

IMBODEN *et al. vs.* THE ETOWAH AND BATTLE BRANCH, ETC., MINING COMPANY.

[This case was argued at the last term, and re-argued by order of court at the present term.]

1. Where one corporation has dealt with another company as a corporation, has negotiated with it concerning the waters flowing in a certain ditch, obtained permission from it to use those waters, and used them for years thereunder, dealing with the presidents, superintendents, attorneys and managers of the second company as officers and agents of a corporation, in a subsequent controversy growing out of the subject-matter of such recognition, the first corporation is estopped from denying the existence of the second.

2. Where those claiming to be the corporators of the second company at the time of the litigation—the president, superintendent and managers—are the same with whom the other corporation has dealt since the alleged illegal organization, and whom it has treated as such corporators, it is estopped from denying them to be such.

3. The evidence in the record is strong enough to show title to the water of the ditch in the defendant in error, and equity will enjoin the other company from depriving the complaining company of the use of its own whenever and wherever it may desire to use it.

4. It is not vital to this right of the complainant to use its own that it should make out an irrefragable title to the entire fee of all the lots, or either of them. If it owns any aliquot part of either lot, or any interest at all in a mine on either; or if it owns no mine at all, having dug the canal and put the water in a reservoir on a commanding height, whence that water may be distributed to surrounding lots whereon there are mines rich enough to be operated with water, it may use its own valuable estate in the water. It can do neither of these things, if the property in the water be destroyed by cutting and tapping the ditch which holds such water and carries it to the reservoir, thus drying it up.

5. The verdict is quite certain on the main issues; as to the damages, there may be some confusion and uncertainty; this is ruled below.

6. The evidence of the search for the original deeds was sufficient to warrant the admission of copies in this case.

(a.) The deeds, the admission of which is complained of in the 10th

and 11th grounds, were admissible, at least as written color of title, to support adverse possession.

7. Conversations between agents of two companies, in which the one applied to the other for the use of water in a certain ditch, are admissible in a contest over the ownership thereof.

8. Receipts and drafts given and drawn by Kelly on the other corporators threw great light on the contemporaneous transactions between these parties touching their joint dealing in regard to these works and preparations for mining, and were admissible for that purpose.

9. Hearsay as to death is admissible testimony.

10. Court papers showing the assessment of damages in favor of a lot owner against a corporation, under its charter, for cutting a ditch through the land, in which assessment one person acted as agent for the company and another as attorney for the claimant, were admissible on a subsequent trial wherein another party claimed the water in the ditch through such agent and attorney.

11. A corporation can only make admissions through its agents, and the admissions of such agents acting within the scope of their powers and about the business of their agency, are admissible.

12. While a written conveyance cannot be altered by parol, parol testimony is admissible to explain what the grantor claimed and the grantee bought as an easement belonging to the property conveyed.

(*a.*) An ambiguity in a deed, latent or patent, may be explained by parol.

(*b.*) The admissions of agents here objected to were admissible and relevant; if any were irrelevant, they did no harm.

(*c.*) Admissions of the president of a corporation in connection with the business of his office are admissible against the corporation.

(*d.*) That a witness, when asked if certain admissions had not been made to him by an officer of a corporation, replied that he thought they had, did not render the answer inadmissible; its weight was for the jury.

13. Exception to the entire charge is too general, and will not be ground for a reversal, if any part of it be good law. The plaintiff in error should particularize errors.

14. What the answer to a bill in equity admits as true, if charged in the bill, need not be proved, though discovery be waived; what the answer denies must be proved, if relied on by complainant; what the answer asserts as true is not evidence for defendant, if discovery be waived, but must be proved *aliunde.*

(*a.*) If more specific instructions were desired, they should have been asked.

Imboden *et al. vs.* The Etowah and Battle Branch, etc., Mining Company.

15. If one company used water by lease or rent from another, the former was estopped from denying the existence of the latter as a corporation, and from denying its title while so using water under it.

(a.) If complainant, or those under whom it derived title, constructed the ditch in part, and defendants, or those under whom they claim title, extended the ditch under a contract to complete it and return it all to complainant, after using the water for a time, then complainant was entitled to all the water at the end of that time.

(b.) Whether a ditch was constructed jointly by three or severally by one, if it was constructed to be used in operating for gold on certain lots, and that one of the three who constructed it conveyed the mineral interest of these lots to the other two, with appurtenances and mining privileges, without making any reservation of the right to cut off the water then flowing in the ditch, or which could flow in it, neither he nor those claiming under him would have the right to divert the water from the property; and the owners would be entitled to its restoration, if so diverted.

(c.) That a corporator is called Easterling in a charter, and Eastman claims to be the corporator, makes no difference, if the others have recognized him as the person intended, and so treated him, and received his money for joint enterprises.

16. If one has the use of another's property for nothing until called for by the owner, and when called for refuses to give it up, it would seem a sound principle that, to measure the damage of the owner, what the borrower made by the use would be a fair criterion; but if the property itself had been largely enhanced in value by the borrower, with the assent of the lender, not only in repairing, but in making extensive and costly additions to the *corpus*, that should enter into the true measure of damages to the owner.

(a.) In this case the loan of water was not strictly a gratuity, there being counter-favors; the ditch was opened where partly filled; its capacity was doubled, and new streams were turned into it; water was rented on the opposite side of the river and carried across in pipes; at the time of demand for the ditch, the owner was not prepared to use it, nor was any customer shown therefor.

(b.) Under the proof, a new trial is granted unless complainant will write off the damages awarded, in which case it will be affirmed. In either event, defendant in error must pay the costs of bringing the case to this court.

September 1, 1883.

Corporations. Estoppel. Damages. Easements. Verdict. Evidence. Admissions. Principal and Agent. Notice. Practice in Supreme Court. Waiver. Practice in Superior Court. Loans. Before Judge WELLBORN. Lumpkin Superior Court. April Term, 1882.

The Etowah and Battle Branch Hydraulic Hose Mining Company filed its bill against Imboden, superintendent, and the Dahlonega Gold Mining Company to recover possession of a certain mining ditch or water canal, located in Lumpkin county, which directed the waters of Mill and other creeks by an artificial channel to a reservoir located on lot number 453, in the 12th district and first section of Lumpkin county; also to perpetually enjoin the defendants from interfering with the ditch or the water therein; to recover damages for the wrongful use of said ditch and water, and to set aside a conveyance of said ditch from one Kelly to Wimpy and from Wimpy to the Dahlonega company.

The substantial defendant, the Dahlonega company, pleaded that the complainant had no corporate existence and no right to sue in a corporate name. Defendant also answered, denying that it went into possession of the ditch as tenant of complainant, as the latter had charged, and claimed the ditch as its own property.

On the trial, the issues made by the plea and answer were submitted to the jury at the same time. The evidence was, in brief, as follows:

On December 13, 1859, the legislature of Georgia passed an act, by which Hezekiah Kelly, Reuben S. Denny and Arthur M. Easterling, and their associates, were incorporated, under the name of The Etowah and Battle Branch Hydraulic Hose Mining Company, with power to construct channels, ditches, canals and aqueducts for the purpose of directing the waters of Mill creek, Lilly's creek and Fletcher's creek from their natural channels for mining purposes. (The corporator's name in the charter is " Easterling," but throughout the transaction " Eastman" acted, and is the name given by the witnesses.) Kelly constructed a canal or ditch, directing the waters of these creeks to a reservoir on lot No. 453, where a mine was worked, and the ore flooded to a mill on lot No. 459, by means of water in the reservoir, in the year 1860. Kelly received from Denny

and Eastman, on December 6, 1859, $3,000.00 each, and gave a receipt, which specified that the amount was all the payment due in fulfillment of a contract between Eastman and Kelly "relative to lands, mines and improvements upon Hightower (Etowah?) river, in Lumpkin county, Ga." The contract mentioned could not be found. On February 20, 1860, Kelly drew a draft for $1.000.00 on Eastman, and on July 19, another for $1,275.00, both of which were accepted. On July 20, 1860, Kelly received from Eastman, $959.00, and gave a receipt, stating that it was for "one-half of the working expenses of the Etowah and Battle Branch Mining Company, up to the first of August, 1860." Prior to this time, on December 23, 1859, Kelly conveyed to Denny and Eastman lots numbers 453 and 459, with all the rights, members and appurtenances belonging to them. On March 6, 1860, Kelly conveyed to Denny and Eastman the mineral interest in lots numbers 384, 387 and 388, "with full privileges of way, wood and water, with all and singular, the rights, members and appurtenances" belonging thereto. On February 5, 1868, Denny and Eastman conveyed the property to Daniel E. Somes. (It was so charged in the bill and copies of deeds from both Denny and Eastman were exhibited, but only the deed from Eastman was put in evidence, conveying his half interest.) On February 6, 1868, Somes conveyed one-third interest in the lots to Loomis, and on April 15, Somes and Loomis conveyed their interests to the Etowah, etc., Company.

In 1861, at the breaking out of the civil war, Kelly left the state and went north. He left the ditch in charge of one Fletcher, and it fell into disuse.

In 1861, a Miss Castleberry proceeded to have damages assessed for cutting the ditch through her property. She proceeded against the company as a corporation, and John A. Wimpy acted as her attorney, and recovered damages.

In 1869, one Jordan (who is mentioned again below) brought suit against complainant as a corporation f,r ser-

vices rendered as their agent, and Fletcher, the agent left in charge by Kelly, was served.

The mine of complainant was known as the Thomas mine; it was on lots numbers 453 and 459; the Battle Branch mine is the one now held by defendant, and is two miles down the river from the Thomas mine.

In 1869, Harrison, Thomas and Bracket purchased the Thomas mine at sheriff's sale, and worked it with the ditch. Harrison testified that they held the ditch under no one, but saw it lying idle and used it.

In 1868, J. O. Jordan, whose suit is mentioned above, took charge of the ditch, under Wing, a director of complainant; he used the ditch and remained in charge about eighteen months. One Theis then took charge, and in 1871, under parol permission from Wing, he cut a lateral ditch for Graham, Perry & Free, from the reservoir to the Battle Branch mine, which they owned lower down the river, and the water was used to work that mine for one season, when it was cut off. Their mine was on lots numbers 523 and 524, and they were stockholders in the complainant. After this one Woody was employed by Wing, and had charge of the ditch until 1874. In 1875, the Battle Branch mine was worked by one Moore, who used water from the ditch. L. L. Lombard bought, through Moore, these lots, 523 and 524. He knew that the main ditch to the reservoir was in the possession of complainant, and through his agent, obtained permission to use water from the reservoir through the lateral ditch. In 1876, Lombard acknowledged to Price, the attorney of complainant, that he was using the water in the ditch and reservoir by permission of Wing, the director of complainant; in 1877, he made like acknowlededgment to one Purdy, and in 1878, to one Clark. The admissions to Price were made in connection with the grant of permission by the company which he represented. The admissions testified to by Purdy and Clark grew out of inquiries made by them as to mines which they thought

of purchasing, and in the course of those conversations, Lombard stated that he had made arrangements with Wing to use the water in the ditch.

On May 21, 1877, the Dahlonega Gold Mining Company, was organized under the laws of New York, and Lombard conveyed to it lots numbers 523 and 524; he subsequently became the president of the company, and while such, made admissions as to using water by leave of complainant, which are set out above. Similar acknowledgments were made in 1877 by Altman, who became the president and agent of the company. (The evidence is not very clear as to the presidency of Lombard and Altman, but it would seem that Lombard had been the president of the Battle Branch company, to which the defendant succeeded; that on the organization of defendant, Altman became its president, and came out to take charge of the mine; and that at some time, not definitely stated, Lombard became the president of defendant.) Thomas R. Lombard, who was the son of L. L. Lombard, and had charge of the Battle Branch mine, went into possession in 1875. He also asked permission to use water from the ditch, and acknowledged that he was using it by permission of complainant.

While the Dahlonega company have been in possession, they have extended the ditch and turned water from other creeks into it, about doubling its capacity. They also rented out or sold water on the opposite side of the Etowah river, and conducted it across the river in pipes, at an expense of several thousand dollars. It also appears that they crushed some ore for complainant without charge. There is no mining on complainant's land, and no preparations therefor; nor has there been any for some years.

Complainant's director, Wing, heard of no adverse claim on the part of defendant till Imboden took charge as superintendent of defendant's works in 1877 or 1878. While Wimpy claimed the property, he filed a bill setting up his right thereto, but it was subsequently dismissed.

The organization of complainant and its changes of offi-cers are thus detailed by Wing: "I have been a director of complainant since 1868, and a stockholder since that time. The first meeting of the complainant that I ever attended or knew of, was in 1868, in Washington, D. C.   D. E. Somes, S. L. Loomis and myself were the only persons present.   We then agreed on officers:   Somes, president; Loomis, secretary, and myself, manager.   We then and there agreed to issue stock.   None had been issued before. We issued 100,000 shares at $5.00 each.   Somes took 33⅓ thousand shares, Loomis 33⅓ thousand shares, and myself 33⅓ thousand shares.   We adjourned that meeting to meet in Dahlonega and ratify the proceedings in Wash-ington.   We met in Judge Rice's office in Dahlonega. Judge Rice was made attorney of complainant, and con-tinued to hold that position till 1871, when he was suc-ceeded by Colonel Price, in 1872.   The meetings have since been held in Colonel Price's office.

"Somes and Loomis sold out their interest to Graham, Perry & Free, in Chicago.   The stock books and minutes, I understood, were burned in Chicago in 1871.   D. M. Graham was elected president in 1871, by a meeting held in Chicago.   I put Jordan in charge, and to clear out the ditch, then Theis.   I don't know how Moore used the ditch; I put Woody in charge of it.

"Loomis, Somes and I formed the company, and Somes and Loomis made the deeds to the company.   They sold to Graham, Perry & Free, and they sold the Battle Branch mine to Moore.   Moore wanted to buy the property of our company, but did not; our company never parted with the title to the property or ditch.   A. Davidson is presi-dent of our company now.   The present company is the successor of the company in Washington City.   Davidson got an interest in the company through us.

"I gave Theis permission to extend the ditch to the Battle Branch mine.   Thomas Lombard never gave me any no-tice of an adverse claim to the ditch.   The first notice I

had of defendant's claim to the ditch was in 1877. I sold a controlling interest in the company to Mr. Betz, of Philadelphia, in 1877. Our company spent on the mine and ditch $2,700; of this $1,500 was on the ditch. The reservoir had to be enlarged. My permission to Graham, Perry & Free to use the water was verbal; so as to Thos. Lombard. I did not use the water in 1877, because I was enjoined by John A. Wimpy.

" All the authority I exercised in the matter was derived from the meeting in Washington City and the meeting held in Dahlonega afterwards. Loomis was present at the meeting held in Dahlonega to ratify the proceedings in Washington City. I was present, and my attorney, Judge Rice; no one else was present. Somes was not here. Kelly was not present. Neither Reuben S. Denny, nor Arthur M. Eastman, nor Arthur M. Easterling, was present. I never have seen either of these three men. Neither Kelly, Denny, or Eastman were present at the meeting in Washington City. I know of no meeting ever being held before the one in Washington City. The stock was divided between Somes, Loomis and myself, and issued to us. The subsequent parties, Graham, Perry & Free, Betz and Davidson, all derived their interest and authority from us. The present complainant is a continuation of the company which met in Washington City, as I have stated. A majority of the stock in the company was represented in the meeting held in Dahlonega to ratify the proceedings of the meeting in Washington City. Loomis and myself were here. No one owned any stock at that time except Somes, Loomis and myself. That stock was the stock we agreed to issue in the meeting in Washington City. We then informally agreed upon the officers and the issuing of stock, and elected the officers agreed on in Dahlonega afterwards. After this meeting I acquired stock sufficient to give me a controlling interest, and was manager and director of the operations of the company."

Powers of attorney from Eastman and Denny to Somes,

authorizing him to represent them at the meeting in Washington, were introduced. They and Kelly were notified to attend.

The chain of title set up by defendant was a deed from Kelly to John A. Wimpy, conveying the ditch and water, dated February 17, 1871; a deed from Wimpy to the defendant, dated December 20, 1878, conveying the ditch and water to the defendant. Defendant also held a deed from L. L. Lombard to lots 523 and 524 (known as the Battle Branch mining property), with appurtenances. Lombard held this under Moore, and he under Graham, Perry & Free. Moore and Graham each testified that the sale included the lateral ditch from the reservoir to the mine, but had nothing to do with the main or Kelly ditch.

In 1879, Davidson, the then president of the complainant, notified Thomas R. Lombard and F. M. Imboden, as agents and superintendent of defendant, that the complainant needed all its water, and would cease to furnish it to defendant, unless further arrangements were made. He cut off the water from complainant's land, and took possession of the Kelly ditch. Several agreements were made in regard to giving notice before further action, all of which are immaterial here. In January, 1880, defendant cut a new ditch so as to tap the main ditch above complainant's land, and diverted the water therefrom, so that it flowed in the new channel instead of the old. Complainant thereupon filed this bill. There was testimony to the effect that there was an average of 100 to 125 miners' inches of water in the ditch, worth about twelve cents per inch per day. Denny and Eastman are both reputed to be dead. There was also some other testimony, which it is unnecessary to detail.

On the close of the evidence, defendants moved to dismiss the bill, which was refused.

The jury rendered the following verdict:

"We, the jury, find for the plaintiff the property in dispute and the damage on 100 inches of water at twelve

cents per inch per day for two years, or 560 days, $6,700, and that the defendant put the water back in the ditch, for perpetual injunction, with cost of suit."

Defendants moved for a new trial, on the following among other grounds:

(1) to (5). Because the verdict is contrary to law and evidence, and not authorized by the pleadings.

(6.) Because there was no finding on the plea of *nul tiel* corporation.

(7.) Because the damages are excessive.

(8.) Because the verdict is void for uncertainty.

(9.) Because the court admitted in evidence a copy of the deeds from Kelly to Denny and Eastman, over objection, on the ground that the originals should be produced. [As a foundation for their introduction, Price, the attorney of complainant, testified that he had never had the deeds; had searched for them in the office of the company in Philadelphia, and failed to find them; applied to a former treasurer of the company, who said they were destroyed by fire in 1871, and applied to every person of the company, present and former, who could likely have had them, and failed to find them.]

(10.) Because the court admitted the original deed from Somes to Loomis.—It was objected to because not proved; not properly admitted to record; because it did not appear to have been executed out of Georgia; and because the certificate of acknowledgment did not show affirmatively that it was made before a person authorized to take such acknowledgments. [The deed was attested only by J. F. Collan, who then added a certificate thereof as a commissioner of Georgia in the District of Columbia.]

(11.) Because the court admitted the deed from Somes to complainant as title to lots 384, 387 and 388. This was objected to, because the description of the land failed to state in what county or state the lots were, and because its execution was not proved. [The description is " all his right, title and interest in all those parcels or tracts of

land as lots numbered four hundred and fifty-three (453) and four hundred and fifty-nine (459), containing 80 acres, more or less, and situated in the 12th district and first section of lots in county of Lumpkin and state of Georgia. . . . Also all his right, title and interest of the mineral interest in and to lots of land three hundred and eighty-four (384), three hundred and eighty-seven (387), three hundred and eighty-eight (388), together with all improvements, ways, easements, rights, privileges and appurtenances," etc. It was attested by John D. Blood, and John S. Hollingshead, commissioner of deeds for Georgia, in the District of Columbia, and was recorded.]

(12.) Because the court admitted in evidence the deed from Loomis to complainant. [Same objections, etc., as above.]

(13.) Because the court allowed Woody, a witness, to testify that Theis said he was superintendent of complainant.—Objected to as incompetent to show such relationship, or the existence of the company, and as hearsay.

(14.) Because the court admitted the evidence of the witness, Woody, that Dr. Thomas Lombard said he used the water by Wing's permission in 1875 and 1876.—This was objected to as irrelevant and hearsay. [The witness testified that he was employed by Theis, and paid by Wing and Loomis; got the money from Price; the water was used on the lower or Battle Branch mine; after Moore, Dr. Thomas Lombard had charge; he was the son of L. L. Lombard; after Dr. Lombard stopped using it, witness cut off the water; Mr. Altman, of New York, organized the defendant's company, and said he was its president; after this, when Altman took charge of the lower or Battle Branch mine, the water was cut off; witness did not turn over water to Altman or give him permission to use it; Altman came up to Dahlonega to see Betz (a member of complainant's company); does not know whether he saw Betz or not; after Altman came back, he turned on the water himself; while Dr. Thomas Lombard

was using it, he said to Mr. Wing: "I would like to have that water to work with from the ditch"; Wing said: "You have been so kind as to beat our ore for nothing, you can take the water till we want it"; Dr. Thomas Lombard was working the Battle Branch mine; this was in 1875 or 1876.]

(15.) Because the court admitted testimony of Harrison, showing the same conversation as just above stated.— Same objection as in ground just above.

(16), (17.) Because the court admitted the two drafts drawn by Kelly on Eastman, July 19, 1860, accepted payable to Denny, endorsed by Denny and Kelly; also the receipt of Kelly to Denny and Eastman, dated October 4, 1859.—Objected to as irrelevant, and because the contract mentioned in the receipt was not introduced or its contents proved.

(18.) Because the court admitted testimony of a witness, Colgate, as follows: "I was not personally acquainted with Reuben S. Denny, but believe him to be dead from having heard so by word of mouth of the late A. M. Eastman, and have also seen documents relating to his death."· —Objected to as hearsay and secondary.

(19.) Because the court admitted the proceedings in the case of ·Castleberry *vs.* The Etowah and Battle Branch Hydraulic Hose Mining Company to have damages assessed for cutting the ditch through her ·land, and the *fi. fa.* and entries thereon.—Objected to because they did not appear to be office papers of the superior court; because they were hearsay; because it did not appear that Kelly or any one else was notified or bound; because it was *ex parte*, and showed that Kelly was not in the country; because it did not bind defendant; because it did not appear that complainant paid the award; because there was no evidence that the ditch went through the plaintiff's land; because the judgment and *fi. fa.* were illegal and irrelevant. [See report of facts above as to this suit.]

(20.) Because the court admitted the record in the case of Jordan *vs.* The Etowah and Battle Branch Hydraulic Hose Mining Company.—Objected to as hearsay; irrelevant and incompetent to prove incorporation of complainant. [See report of facts above as to this suit.]

(21.) Because the court admitted evidence of Wing that Thomas Lombard, in 1875 or 1876, applied to him for water, and said he wanted it to test a mine of J. E. Woods. —Objected to as irrelevant and hearsay. [Compare the 14th ground.]

(22.) Because the court admitted testimony of Price, in substance, as follows: I was the attorney of complainant; I learned that Moore was in possession, using the water, and I went to him about it; he said he had leave to use the water from Graham, Perry & Free, who said he would be allowed the use of the water until the upper company needed it. He recognized the Etowah and Battle Branch Company's right to the ditch above the reservoir. I next heard that Dr. Thomas Lombard was using the water; I went to see him about it; he told me he had Wing's permission to use the water from the reservoir. He recognized the Etowah and Battle Branch Company's right to the water. He said that he did not think the upper company would want it for a long time. He asked witness the effect of Wimpy's suit. The case was in court over two years. Thomas Lombard frequently said he thought he would hold the ditch a long time, as the upper company's mine was not a good one, and he did not think they would ever put up a mill. In 1875 or 1876, I met L. L. Lombard at the Battle Branch mine; he said he was at the mercy of the upper company for water, and that he had found out he only owned that part of the ditch from the reservoir on the upper property to the Battle Branch mine. Tom Lombard recognized me as agent for the company while he was there.—Objected to as hearsay, irrelevant and incompetent to show title.

(23.) Because the same witness was allowed to testify

substantially as follows : In 1877, Altman took charge of the Battle Branch mine for defendant. The water was not then running in the ditch. I told Altman that Betz and other directors would soon be at Dahlonega, and Altman could see them and make terms about the use of the water. I told him I would not disturb him in the use of the water until the litigation with Wimpy was ended: I told him in the meantime I would tell Woody to let him have water. Altman said his company had been incorporated and listed on the stock board, and that if the water question was not settled, it would affect the stock; that L. L. Lombard had sold the lots to the defendant, and the latter had organized and owned the ditch up to the reservoir; that Lombard had told him that he (Lombard) had been using the water by permission of Colonel Wing. Altman proposed to make an arrangement to extend the ditch, take in the waters of other creeks, increase the water two-fold, take out the water at the reservoir and divide it equally or equitably between the two companies; but no arrangement was made.—Objected to. [No ground stated.]

(24.) Because the court admitted in evidence the testimony of the witness, Betz, substantially as follows: Witness was a director of complainant; he and another came out to Dahlonega; Altman went to see them; introduced himself to them; wanted to effect an arrangement for the use of water by his company, the defendant; he said that the only privilege they had so far was a verbal permission from Colonel Wing, who said they could use the water of the upper company until the latter started up, and that they would then have to make special arrangements for the water. [No ground of objection stated.]

(25.) Because the court admitted the following evidence :

First. Witness Graham testified substantially as follows: Witness and his partners, as owners of the Battle Branch mine, did not claim the ditch, but had stock in the company that did own it, and extended the ditch by Wing's per-

mission to the Battle Branch mine, and sold the extension and Battle Branch mine to A. H. Moore; he must have known that we sold only the extension, and he contracted for stock in the company that did own the remaining part of the ditch.—Objected to: 1st. Because the deeds would be the best evidence of what he sold. 2d. Because the evidence was irrelevant. 3d. Because it related to contracts and conversations of persons not parties to the suit.

Second. Purdy testified substantially as follows: Lombard was president or vice president of defendant; he was its manager. I had a conversation with him in 1877 or 1878 about taking hold of the property of the lower mine with him. I told him I could not do anything with it, unless the water question was settled. The question was between Wimpy and Wing as to the ownership of the main ditch. Lombard said he had made arrangements with Wing to use the water, and had it sure . . . Altman, who was at one time president of the defendant, made similar statements to this witness.—Objected to as hearsay and irrelevant.

(26.) Because the court admitted testimony of Moore, substantially as follows: Bought the Battle Branch mining property from Graham, Perry and Free; knew that purchase only included the lateral ditch from the reservoir to the mine, and not the main or Kelly ditch, or any right under it; Graham, Perry and Free told him that there was no doubt that they could use the Kelly ditch for a long time, as the Kelly mine was not using and not likely to use it. Witness tried to buy a controlling interest in the complainant, and failing in that, tried to rent the Kelly ditch, but also failed in that. Lombard knew of these facts before his purchase, and conversed with witness on the subject.—Objected to as irrelevant, secondary evidence, and including conversations and transactions to which defendant was not a party.

(27.) Because the court admitted testimony of a witness, Clark, substantially as follows: Wanted to buy a mine adapted to hydraulic mining; Lombard said he knew a

mine owned by the Etowah and Battle Branch company, which he thought was adapted to the purpose ; that witness could get water from a ditch known as the Kelly ditch, which was claimed either by that company. or by Wing ; that he (Lombard) had made an arrangement with Wing to use the ditch and water on condition that Lombard would put the ditch in order and so keep it until needed by Wing ; some four months thereafter, Lombard informed the witness that he had bought the Wimpy claim to the Kelly ditch, because he thought it a better title than that of Wing. These conversations occurred in December, 1878, and January, 1879. Lombard is president of defendant, and witness thinks he was then so.—Objected to as irrelevant and relating to transactions and conversations to which defendant was not a party. The witness also testified that "I think Mr. L. L. Lombard said to me that the Dahlonega com pany had procured the use of the water from Colonel Wing, and had the use of it only until the Etowah and Battle Branch company resumed operations in their mines."—Objected to as irrelevant, not binding on defendant, and as the mere thoughts of the witness.

(28.) Because the court admitted testimony of Somes, substantially as follows : Kelly was notified to attend the meeting in Washington City to organize the Etowah and B. B. H. H. Mining Company, as shown by the papers at tached.—Objected to, because the papers alluded to were not in evidence.—Also, that Eastman and Denny were both notified to attend the meeting to organize, in Washington City.—Objected to, because the notice ought to be in writing; because it was not shown how, when, or by whom such notice was given, and because no legal meeting for that purpose could be held in Washington City.— Also, that Eastman and Denny gave witness powers of attorney to represent them in said meeting, and that he represented them under power of attorney.—Objected to as secondary.

(29.) Because the court admitted in evidence a power

of attorney, signed by Arthur M. Eastman, authorizing D. E. Somes to represent him in the meeting called to meet April 4, 1868, in Washington City, to organize the Etowah and Battle Branch Hydraulic Hose Mining Company, under the charter granted by the legislature of Georgia. Witnessed by F. C. Somes, S. L. Loomis. The foundation laid for the introduction of this power of attorney was the testimony of Somes that Eastman gave it to him in his office.—Objected to by defendant, 1st. Because its execution was not proved. 2d. Because the subscribing witnesses were neither of them produced, nor their absence accounted for. 3d. Because the power was void, being an attempt to authorize an act *ultra vires*. 4th. Because Eastman does not appear to be a corporator.

(30.) Because the court admitted a like power of attorney from R. S. Denny.—Same objections as to that just above.

(31.) Exception to entire charge as vague, uncertain, unfair and not·covering the issues.

(32.) Because the court, although requested to give his entire charge in writing, after charging that complainants claimed that a charter was granted to Kelly, Denny and Easterling, added verbally, " said to be Eastman."

(33.) Because the court charged as follows : " The privileges and franchises conferred by this charter were conferred on these parties named and their associates and assigns."

(34.) Because the court charged as follows : " If you are satisfied from the testimony that the complainants were a company organized as required by the charter at the time of the filing of their bill, and that they are the successors of the corporators named in the charter, and were in the use of the charter, then they would be authorized to use the corporate name, and sue in that name."

(35.) Because the court charged as follows : "That would be an acceptance if the original corporators constructed a ditch, under the charter."

(36.) Because the court charged as follows : "The original

corporators under the charter, named in the charter put in evidence, had the right to assign their interest, to associate others with them, and to have successors."

(37.) Because the court charged as follows : "The charges and statements in the bill which are admitted to be true by the answer need no further proof ; but all such matters as are denied by the answer to be true, it is incumbent on the complainants to sustain by proof, if relied on. The statements set up in the answer of defendants, although the answer is sworn to, are not evidence for the defendants, unless they are sustained by proof."

(38.) Because the court charged as follows : "If you are satisfied from the evidence that the defendants rented or leased the ditch and water from the Etowah and Battle Branch Mining Company, then the defendants are estopped from denying the existence of the company during the existence of their tenancy."

(39.) Because the court charged as follows: "If you should believe from the testimony, that the complainants, or those from whom they derive title, cut a part of a ditch, and that the defendants, or those from whom they claim, extended the ditch, under a contract or agreement with the complainants to complete it and return the entire ditch to the complainants after a certain use of it, then the complainants would be entitled to have all the water which flows through the ditch, pass on to them, if the time had expired that the defendants were to have the use of it."

(40.) Because the court charged as follows: " If you should believe from the testimony that the ditch was constructed jointly by Kelly, Eastman and Denny, with their joint funds, or by Kelly alone, and that it was constructed to be used in operating for gold on the lots aforesaid, and that it was necessary to the use of the lots as a mine, and that Kelly conveyed all of his interest in these mineral lots, with their appurtenances and mining privileges, to Eastman and Denny, and made no reservation of the right to cut off the water thus flowing in the ditch, or about to

be turned into it, above that point, neither Kelly nor those holding under him, would have any right so to divert it, and the complainants would have a right to have the water come to this property as when they purchased it."

(41.) Because the court charged as follows: "If you should believe that the ditch and the water flowing therein is the property of the complainants, and the defendants have diverted the water and used it themselves to the damage of the complainants, and without their consent, then the complainants would be entitled to recover for damages such amount as the use of the water is shown to have been worth for the time it has been used by the defendants after the withdrawal of the consent of the complainants; and if the defendants received the ditch from complainants and used it under them, they would be estopped from denying their title, and setting up an adverse claim to it until after notice to the complainant of such adverse claim and attornment back to them."

The motion was overruled, and defendants excepted.

M. L. SMITH; C. D. PHILLIPS; H. H. PERRY; L. E. BLECKLEY, for plaintiffs in error.

PRICE & BAKER· H. P. BELL; M. G. BOYD; A. DAVIDSON, for defendant.

JACKSON, Chief Justice.

A bill was filed by defendant in error against the plaintiffs in error to enjoin the latter from interference with the water of a long ditch or canal claimed by the former, to compel the restoration of the water to the original ditch or canal, from which it had been diverted by the plaintiff in error by tapping that ditch above the lots owned by defendant in error, and to recover damages for such diversion of the water from the true owner thereof.

On the trial of the case before the jury, a verdict was rendered granting that injunction, directing the restoration

of the water, and rendering damages to the amount of six thousand five hundred dollars for the complainant against the defendant; and a decree in accordance with that verdict was entered by the chancellor thereon.

Pending the trial, a motion was made at the close of the testimony to dismiss the bill, and on the denial of that motion, error is assigned here. After verdict, a motion was made to set aside the decree, on various grounds therein taken, and to annul the same, and a motion for a new trial on a vast array of grounds therein taken.

These motions were all overruled by the court, and error is assigned here also on the judgment overruling them.

In the view which we have taken of the case, it will be unnecessary to consider all the grounds taken in these various motions. The ditch is very long and not free from mud, though traversing a mountain country; it was the duty of the plaintiff in error to remove enough of that mud to enable this court to see what of gold there was in the ditch, or at its extremity, for the Dahlonega corporation; and before the bill of the Battle Branch company could have been legally dismissed at the close of its testimony, the Dahlonega company should have opened the entire ditch to show that no gold at all was in it for that other contesting corporation. In other words, to show that its claim to the ditch had no equitable merit in it—no right to the water it claimed or the use of that water—and therefore no admittance at all, on the facts it made, to the temple of justice at its equitable door.

1. As well on this motion to dismiss as on the motion for a new trial, the plaintiff in error rested its case mainly on the idea that the Battle Branch company had no legal existence—no privilege to sue—and therefore the door should have been shut in its face at the outset; and after it had got in, what was done for it by verdict and decree should be undone, and a new trial awarded.

Unfortunately for the Dahlonega company, however, it dealt with the Battle Branch company as a corporation

repeatedly, in respect to the waters of this very ditch, it actually obtained its permission to use those waters; it did use those waters under that permission for years; it dealt with its attorneys, its presidents, its superintendents and managers, as attorneys, presidents, superintendents and managers of a corporation, known and recognized by it as the Etowah and Battle Branch Hydraulic Hose Mining Company. It called it by the name, the long name, the very remarkable and distinguished name, by which it was clearly distinguishable from all the world of creatures, corporeal and incorporeal, and which it had received by baptism at the christening fount of the general assembly of the state of Georgia. Surely such a recognition of the infant by name; such a dandling and handling it; such billing and cooing with it; such reception of gifts and favors from it; such drinking the water of the child's ditch by permission of the little creature, must estop, in all courts, both of law and equity, the recipient of such favors from denying the existence—the breath in the body of the being with whom it thus dealt so long and from whom it received (much of it without money and without price, too,) so many favors.

This court, as indeed all civilized courts, has ruled that such recognition of a being—even of an artificial being—will stop the mouth of any other being, natural or artificial, from denying, in a case growing out of such recognition, that the being thus recognized ever had being. *Planters' and Miners' Bank* vs. *Padgett,* 69 *Ga.,* 159; *Georgia Ice Co.* vs. *Porter & Meakin,* 69 *Ga.,* 159. (This term; not yet reported.)

This record abundantly and conclusively shows repeated recognitions by the Dahlonega Gold Mining Company of the Etowah and Battle Branch Hydraulic Hose Mining Company touching this water and these mines, so that the fact of the recognition and dealing of the one company with the other as a *de facto* corporation, is established ; and

v 70-8

such being the fact, the law is that it must still recognize the old acquaintance as a live person.

So that the plea of " *nul tiel corporation* " is no legal plea, under the facts proved in this case ; and the complainant can sue, and enter the court, and may abide there as a person entitled to sue this defendant and respond to it, or other persons through it, with whom it may be litigant touching this water.

2. It was with the present corporators, too, that it dealt, with the *personnel* now composing it, with the presidents, superintendents and managers, since the meeting in Washington City and afterwards in Dahlonega, Georgia ; and hence, it cannot deny these organs—this *personnel*, by which alone the artificial equity can breathe, talk, grant licenses, make bargains, lease or give away its water-power or other property, or otherwise act as a live person. Hence, everything in this record which attacks the defendant in error on any matters affecting the charter or the organization under it, or the place where it was organized, are swept away by the same principle which estops a denial of its existence as a living being.

These principles above indicated rule the points made in the 6th, 20th, 28th, 29th, 30th, 32d, 33d, 34th, 35th and 36th grounds of the motion for a new trial, as well as the error assigned on the denial of the motion to dismiss the bill on the ground that there was no proof of complainant's corporate existence.

3. But conceding, as plaintiff in error must, that the complainant is a corporation, is there evidence to show that it is entitled to relief in equity in respect to this ditch and the water in it, and the cutting off that water by the plaintiff in error ? That depends on its title to the water in the ditch. How is the Etowah and Battle Branch Hydraulic Hose Mining Company entitled to the ditch and the flow of water therein ? And is there evidence of title to that water in this record sufficient to uphold the verdict ?

We are of the opinion, from a careful examination of

the evidence disclosed by the record, that the company, or men who composed it originally, constructed the ditch and derived their title to it from the legislative grant of power to construct it and the actual construction thereof by expenditure of money therefor.

Hezekiah Kelly supervised the work, employed the hands, and paid for it. By what authority could he construct such a work through the lands of others for fifteen or twenty miles as an individual? He could not, except by purchase of the right of way through the lands of each owner thereof, or the purchase of the lots themselves. The record fails to show that he did either. On the other hand, it shows that he, with two others, was made a body corporate to do this very thing—to construct this ditch; that the company thus chartered was called by the identical name it now bears; that it was chartered about the time this work was commenced and in progress; that in the same act another company, of which the same Kelly was also a member, was chartered to construct another ditch on the other side of the Etowah river; that the charters were granted upon the idea and for the purpose of getting water to work mines, and to that end authorized the settlement of damage to the owners of lots through which the canals might be cut, as in cases of railway charters.

It was under this charter, beyond all question, that Kelly proceeded to cut this ditch. The evidence further shows that, touching business connected with these mines and this ditch, Kelly was paid by the other corporators of this company. Receipts and drafts pointing closely in that direction, if not perfectly straight to that conclusion, are in testimony, as the record shows. Eastman and Denny were not corporators in the other company.

There is, therefore, evidence to a moral certainty that the original corporators paid for the ditch. One of them dug it, superintended and paid for the labor, and the other two paid him therefor. The ditch so cut was carried to a

reservoir on one of the lots owned by the same parties, and this reservoir was also dug by Kelly, and there this ditch at that time terminated.

Kelly first owned this lot, but conveyed it to the other two corporators, Denny and Eastman, on the 23d of December, 1859, with all rights, members and appurtenances, and on the 6th of March, 1860, conveyed to them the three other lots, 384-7-8, or all the mineral interest he had therein, with all necessary easements for mining purposes. About the same time the following receipt was given by him :

"NEW YORK, December 6th, 1859.

"Received of Arthur M. Eastman and Reuben S. Denny three thousand dollars each [six thousand dollars], being all the payments due in fulfillment of a contract between said Eastman and myself dated October 4th, 1859, relative to lands, mines, and improvements upon Hightower river, in Lumpkin county, Georgia. H. KELLY."

> $3,000.00
> 3,000.00
> ─────────
> $6,000.00

Another receipt was also given in the July following as follows :

"NEW YORK, July 20th, 1860.

"Received of A. M. Eastman nine hundred and fifty-nine dollars for one-half of the working expenses of the Etowah and Battle Branch Mining Company up to the first of August, 1860.

H. KELLY, *Agent.*"

$959.00.

And in addition to these receipts, two drafts were drawn by Kelly on Eastman for $1,000 and $1,275, on February 20th and July 19th, 1860, during the progress of the work, and were duly paid by him.

In addition to all this, it further appears that suit was instituted in 1861 against the company for the damage assessed under the charter to lots of land between the owners and Kelly, as agent of the company, brought by John A. Wimpy, as attorney for the plaintiff.

The defendant corporation, the Dahlonega Gold Mining Company, sets up in its answer title to the ditch from Kelly

to John A. Wimpy, and Wimpy to them.    Hence, Wimpy, their immediate grantor, had full knowledge of the agency of Kelly for the company, and so the Dahlonega company must be affected therewith.

These facts show that the company now suing—afterwards more fully, by Denny and Eastman at Washington City and Dahlonega, organized and put in operation by electing officers—constructed the ditch, and certainly hold title to the water as against the plaintiff in error at least, who used, under the organization thus put in operation, the water of the ditch, recognizing the title of complainant thereto.

So that we think and hold that the evidence in the record is strong enough to show title to the water of the ditch in the defendant in error.

If so, equity will enjoin the other company from depriving the complaining company of the use of its own, whensoever and howsoever it may desire to use it, and will restore to the owners the use of its own ditch.

4. Nor is it at all vital to this right of the complainant to use its own water on mines located on certain lots, that it does not make out an irrefragable title to the entire fee of all the lots, or of either of them.    If it owns any aliquot part of either lot, or any interest at all in a mine on either, or if it owns no mine at all, having dug the canal and put the water in a reservoir on a commanding height, whence that water may be distributed to surrounding lots whereon there are mines rich enough to be operated with water, it may use its own valuable estate in the water, or sell it for a valuable sum of money to some other person, neither of which can it do if the property in the water be destroyed by a neighbor cutting and tapping the ditch which holds the water and carries it to the reservoir there, thus drying it up.

These views, under the last two heads, will control many other points in the motion for a new trial, embracing the 1st, 2d, 3d, 4th and 5th general grounds, that the verdict

is contrary to evidence, it not being contrary thereto in respect to the injunction, against the use of the water and commanding its restoration to the original ditch.

The 6th ground has been disposed of. The 7th relates to damages and will be hereafter considered.

5. The eighth charges that the verdict is vague and uncertain. The verdict is, "We, the jury, find for the plaintiff the property in dispute, and the damage on one hundred inches of water at 12 cents per inch per day, for two years or 560 days, $6,700, and that the defendant put the water back in the ditch, for perpetual injunction, with cost of suit."

The verdict is quite certain on the main issues, as it appears to us. There may be some confusion and uncertainty about the damages in regard to the two years and 560 days, which will be considered hereafter.

6. The ninth ground is in respect to the admissibility of record copies of deeds lost. The evidence of the search for the originals was enough, we think, to admit the recorded copies, which are the next best evidence. The tenth, eleventh and twelfth grounds relate to the admission of other deeds. They appear to us admissible at least to support adverse possession, and as written color of title to that end.

7. The 15th ground was properly overruled. The conversation objected to was between agents of the two companies, and showed that the Dahlonega company used the water of the Battle Branch company, by permission of the Battle Branch company, through its agent at the time.

8. The 16th and 17th grounds are objections to the admission of the receipts and drafts given and drawn by Kelly on the other corporators, before alluded to, and which threw great light on the contemporaneous transactions between these parties touching their joint dealings in regard to these works and preparations for mining on the Etowah river. They were admissible for that purpose.

9. The 18th was properly overruled. Hearsay, as to death, is admissible testimony.

10. The court papers of the suit of E. Castleberry against the Battle Branch company, for damages assessed by arbitrators under the charter, selected according to it, through Kelly as the agent of the company and the plaintiff, the suit being brought by Wimpy as attorney, were admissible, because, as already stated, the Dahlonega company set up title to the water under Kelly and Wimpy. So the 19th ground was properly overruled. The 20th has been disposed of.

11. The 21st, 22d, 23d and 24th grounds were properly overruled for the reasons that they were admissions of agents and officers of the Dahlonega company, and the admissions of such agents acting within the scope of their powers and about the business of their agency. Unless such admissions are binding on a corporation, it cannot be bound by admissions at all. The only way in which a corporation can talk and admit is by agents. It is dumb as well as deaf by itself, having no organs of speech or hearing except by natural persons as its agents.

12. The 25th relates to the interrogatories of Graham explanatory of the part of the ditch conveyed by himself and partners to the Dahlonega company, or those under whom they claimed, to the point that the conveyance related only to the ditch cut from the reservoir down to the Hockenhull or Battle Branch mine, and not to the main Kelly ditch at all. It does not alter, vary or add to the written conveyance, but explains what the conveying party claimed, and the other side bought, as an easement. It was admissible, too, as explanatory of an ambiguity, which under the Code of this state may be explained by parol, whether the ambiguity be latent or patent.

This ground also objects to other answers which gave admissions of agents of the company, and has been already ruled in principle; and some of them are also said to be irrelevant. They appear generally relevant; if irrelevant, it is not shown how plaintiff in error was hurt.

The 25th ground, therefore, was properly overruled.

The 26th relates to what the purchaser swore on this trial to the same effect, showing that he, Moore, understood the scope of the conveyance in the same way. The other objections to these interrogatories of Moore relate to admissions of agents of the Dahlonega company, and are controlled as to this point and irrelevancy as the 25th ground is ruled.

The 27th ground relates to Clark's interrogatories, and the objection rests on the inadmissibility of sayings and admissions of the president of the Dahlonega company. Of course they were admissible. It was for the jury to weigh what the witness said, whether positively recollecting the admission of Lombard, or thinking, to the best of his recollection, that he did say so and so. Besides, there is abundant other evidence of these admissions, and plaintiff in error was not hurt.

The 28th, 29th and 30th grounds have been disposed of.

13. The 31st ground objects to the entire charge without specifications of particular portions as exceptionable. The rule in such cases is that if any part be good law, the objection will not be considered. In so far as this objection pronounces it all as vague, uncertain, not covering the issues and points, but going out of them—not presenting points of the Dahlonega company, but giving undue prominence to the Battle Branch company's points, inaccurate in statement and calculated to mislead the jury and erroneous, we have to say that we cannot so see it, and that the plaintiff in error has failed to particularize wherein it is thus so erroneous.

The 32nd, 33rd, 34th, 35th and 36th grounds have been disposed of.

14. There is nothing in the 37th ground. What the answer admits as true, if charged in the bill, need not be proved, though discovery be waived. What the answer denies must be proved in such cases, if relied on by complainants. What the answer asserts as true is not evidence for defendant, if discovery be waived, but must be proved

*aliunde.* These are rules so well established that it is rather surprising that points are made upon them as objectionable in a charge to the jury. If plaintiff in error wished any addition thereto as to admissions in complainant's bill, and the effect of those admissions, the judge's attention should have been called thereto. This was not done; nor has any admission been pointed out to us in complainant's pleadings which could have helped the defendant, if the court had applied the principle without being requested to do so. Plaintiff in error was not, therefore, hurt by the omission.

15. The 38th, 39th and 40th grounds of the motion complain of charges to the effect that if the water was used by the Dahlonega company by lease or rent from the Battle Branch company, the former was estopped from denying the existence of the latter as a corporation, and from denying its title while so using the water under it; that if complainants, or those from whom they derived title, constructed the ditch in part, and defendants, or those under whom they claim, extended the ditch, under a contract or agreement to complete it and return it all to complainant, after using the water for a time, then complainant was entitled to all the water at the expiration of that time; and that if the ditch was constructed jointly by Kelly, Eastman and Denny, with their joint funds, or by Kelly alone, and that it was constructed to be used in operating for gold on certain lots, and Kelly conveyed the mineral interest of these lots, with appurtenances and mining privileges to Eastman and Denny, and made no reservation of the right to cut off the water then flowing in the ditch or which could flow in it, then neither Kelly nor those claiming under him would have any right to divert the water from complainant's property, but they would be entitled to its restoration if so directed.

It strikes us that there is evidence sufficient in the record to authorize these charges in substance; and the principles and views already announced seem to us substantially to

cover the legality of them as given. The doctrine of estoppel clearly covers the first, the 38th ground; the same principle would cover the 39th ground, especially as there is evidence tending to show a contract to the effect that the Dahlonega company, or those from whom they got it, were to cease using the water when notice was given to it to cease to use it, and then were bound by the contract to restore it, though while using the ditch permissively they did extend and enlarge its water-power. Nor is there more merit apparent to us in the last paragraph above substantially set out, which is the 40th ground of the motion. If Kelly did convey these lots or the mineral interests therein, with mining privileges, to two persons who dug this ditch in a company or jointly with him, or if he dug it alone, with the reservoir containing water fit for those mining purposes, ought not equity to estop him from cutting off the supply of water from that ditch and reservoir? But it has been held by us that in our judgment, on the facts, the three dug it together under the charter, and the title is in the company; therefore this charge, if erroneous, does not affect the real merit of the case.

In respect to the charter naming Easterling, and not Eastman, as a co-corporator with Kelly, it is enough to say that Kelly recognized Eastman as the man meant in the charter, and so treated him, and got his money for joint enterprises touching the charter, and that the Dahlonega company hold under Kelly.

16. The 41st ground relates in part to estoppel in denial of title after use of the water and during tenancy under the Battle Branch company, and in so far as that ground excepts to the application of estoppel to denial of title under that state of facts, it is apparent from what we have already said that we see no error in it. The charge excepted to, however, goes further, and lays down a rule to measure the damages of the complainant, conceding that it has made good its title; and that rule, as well as the

question, whether the evidence and law of the case touching damages sustain the verdict, will now be considered.

The measure of damages prescribed by the court in the charge excepted to is as follows: " If you should believe that the ditch and the water flowing therein is the property of complainants, and that defendants have diverted the water and used it themselves, to the damage of complainants and without their consent, then the complainants would be entitled to recover for damages such amount as the use of the water is shown to have been worth for the time it has been used by defendants after the withdrawal of complainant's consent." Is this rule the law of this case?

If one has the use of another's property for nothing until called for by the owner, and when called for refuses to give it up, it would seem a sound principle that to measure the damage of the owner, what the borrower made by the use would be a fair criterion; but if the property itself has been largely enhanced in value by the borrower with the assent of the lender, not only in repairing, but in making extensive and costly additions to the *corpus*, ought not that to enter into the true measure of damages to the owner? He not only gets back his own in better repair than when he loaned it, but of double capacity. Nay, the very loan was of advantage to him in the case at bar, as the Battle Branch company thought it better to have water in the ditch than have it dry, and the work of the Dahlonega company opened it to a large extent where filled up, so as to flow the water. Besides, the evidence shows that the complainant had received favors itself from defendant, and the loan of the water was not exactly a gratuity, but amounted to a *quid pro quo*. In addition to all this, the capacity of the ditch was doubled, by opening for the first time other streams of water into the Kelly ditch.

Let it be borne in mind that the inquiry is, what damage did the complainant receive. How much was it injured? Is it not enough that the defendant doubled the

capacity of the ditch, and thereby doubled its value either for use or rental; and shall it pay more?

Besides, where could complainant have used the water from the time it demanded restoration of it up to the trial? It was not ready to use it on mines of its own. When would it get ready? There is no proof that it had made, or tried to make, preparations to mine on its own lots. Where could it have rented the water? To what other company? There is no evidence in this record of any customer it had or could have got.

Moreover, the defendant rented the water on the other side of the Etowah river, and in order to do it carried it across the river by pipes, at the expense of thousands of dollars. Is it to pay for all the water carried there at full price, with no deduction for the expenditure in conveying it? The evidence does not show how much, if any, it used on the side of the river where the reservoir of complainant was, nor how much it rented on the other side after, and by reason of, that heavy expenditure; yet the charge was construed to authorize, and the verdict found defendant liable for all the water, without allowing it any equitable set-off at all.

We consider, therefore, the charge, as construed and applied by the jury, erroneous and the verdict wrong. On the point of damages, too, it is confused. It is for two years' use, and yet for 560 days. Deducting Sabbath days, and yet the remainder of two years is not 560 days. Even at 12 cents per day for 560 days, the verdict is inaccurate. It should be $6,720.00, and not $6,700.00.

True, the defendant cannot complain of its being less than it ought to have been by twenty dollars, as it makes that much by the error; but the difference in time of the finding and the inaccuracy of the calculation of amount on either the two years or the 560 days, show a want of careful consideration of the case. And this, added to the stronger reasons of the failure of the judge to guard the jury in respect to those elements of this case which would

make the naked measure of damages he laid down unfair, and of the fact that the verdict as found is unsupported by evidence of damage to the extent found, on any equitable rule, requires that it be set aside and a new trial had, unless the complainant write off the damages. The only evidence touching damages in the record is that there was one hundred inches or one hundred and twenty-five inches of water in the ditch, and that the customary rate of rental along the line and from the reservoir was 12 cents per inch per day. There is not a particle of evidence that complainant could have used it or rented it to a person upon earth, natural or artificial, at that or any price, and that therefore it was worth that money to it.

It is therefore ordered that a new trial be granted, unless the complainant below, the defendant in error here, shall write off the damages; in that event let the verdict as to the right of property, the restoration of the water, and the perpetual injunction stand, and the decree be modified accordingly.

In either event, the defendants in error must pay the costs of bringing the case to this court, as plaintiff in error was constrained to sue out this writ of error in order to have the damages set aside.

Judgment accordingly.