HAYDEN *v.* MITCHELL, executrix.

1. A copy of an instrument required by law to be registered, which has been taken from the proper registry, is admissible in evidence when the loss or destruction of the original has been satisfactorily shown. The preliminary inquiry in relation to such loss or destruction is addressed to the sound discretion of the presiding judge, and a greater or less degree of diligence will be demanded according to the circumstances and the character,

nature, and age of the document. The fact that a due registration appears in the proper place is presumptive evidence of the existence of an original; and where such appears, and the evidence shows that a great many years have elapsed since the date of its execution, that the parties to it are dead, that diligent search has been made among the papers belonging both to living and deceased persons who were entitled to its custody, such loss or destruction is sufficiently shown to admit the copy as secondary evidence.

2. Where the registry law required a marriage contract to be recorded in the office of the clerk of the superior court of the county of the residence of the husband within three months after its execution, and such contract recited that at the date of its execution the residence of the prospective husband was in a specified county, a record of the instrument made after the marriage and within the time prescribed was properly made in another county, when the marriage was not consummated until after the lapse of one month from the execution of the contract, and from the date of and subsequent to the marriage the husband continuously resided in the latter county.

3. The validity of a contract executed on Sunday is to be determined alone by the statute law in force at the time of the execution of the contract, and when the statute governing the question declares that "no tradesman, artificer, workman, laborer, or other person whatsoever, shall do or exercise any worldly labor, business, or work of their ordinary callings, upon the Lord's day (works of charity and necessity excepted)," only those contracts which may be properly included as coming within the ordinary callings of the parties thereto are affected by the inhibition of the statute. A marriage contract is not one which falls within the "ordinary calling" of the parties to the same.

4. The case of *Sanders* v. *Johnson*, 29 *Ga.* 526, reviewed and affirmed.

Argued December 4, 1897. — Decided March 1, 1898.

Complaint for land. Before Judge Lumpkin. Fulton superior court. March term, 1897.

*Dorsey, Brewster & Howell* and *Hugh M. Dorsey*, for plaintiff.
*E. M. & G. F. Mitchell* and *Alexander & Lambdin*, for defendant.

LITTLE, J. The plaintiff is one of the children of Harriet Eliza Hayden and J. A. Hayden, and a grandson of Lucinda Cone, widow of Reuben Cone, who intermarried with W. H. Underwood. He brought his action to recover a one-ninth undivided interest in certain land in the city of Atlanta. He relied in part for a recovery upon an alleged marriage contract which it was claimed was entered into after the death of Reuben Cone, between W. H. Underwood of Floyd county, and Lucinda

Cone of Fulton county. It was alleged by the plaintiff that the original had been lost, and he offered to introduce in evidence a copy of such contract from the records of Fulton county. The contract in question purports to have been executed in Fulton county, Georgia, and is dated November 5, 1854. It recites that William H. Underwood, of Floyd county, State of Georgia, in consideration of a marriage to be had and solemnized between him and Lucinda Cone, of Fulton county, does covenant, grant and agree, among other things, that certain real estate in the city of Atlanta, Fulton county, Georgia, which belonged to the estate of Reuben Cone, the late husband of Lucinda Cone, and which has not been sold since his death, and which is in the possession of Julius A. Hayden, tenant in coparcenary with Lucinda Cone, as equal heirs of Reuben Cone, and all of the property belonging to Lucinda, together with the profits of the same, shall form and remain her separate property and estate during her life, and then to be the property in fee simple of Harriet Eliza Hayden and her children, and shall not be subject to the debts of said Underwood, nor be sold or conveyed by him, nor in any manner controlled by him, but that the right and title to this property shall be vested in Julius A. Hayden and John Glen for the sole and separate use of said Lucinda. It is further covenanted and agreed that said Lucinda may dispose of such property by will to Harriet Eliza Hayden and her children, if she chooses to do so after marriage. From the copy, this contract purports to have been duly executed, and was recorded on the 7th day of December, 1854. It appears to have been probated on the oath of one of the witnesses on the 6th day of December, 1854. It appeared that in the record book in the clerk's office and near the bottom of one or two of the pages from which this copy was taken, from long use and handling, a few of the words of the contract as there recorded had become somewhat defaced, some of the words illegible and a few altogether missing, small portions of the page being worn off.

As a foundation for the introduction of this copy as secondary evidence, R. C. Hayden, the plaintiff, testified that he did not have in his possession the original marriage contract be-

tween his grandmother, Mrs. Underwood, and Judge Underwood; that he had looked thoroughly for it, but it was not in any of the papers that his father had, nor in those of his mother or grandmother; that he had made inquiry of them and others and had not been able to find it; that he did not know and could form no idea where it was; that Mrs. Lucinda Underwood died in 1873; that his mother was a daughter of Reuben Cone and Lucinda Cone, afterwards Lucinda Underwood; that she was the only child; that his mother has eight living children, and is living herself; that his father died in February, 1890; that John Glen died in 1896; that plaintiff is twenty-six years old. In connection with the copy contract from the record offered in evidence, the plaintiff also introduced a witness, Anderson, who testified (a certified copy being waived), that he made this copy of the marriage contract from record book A, of the records of Fulton county; that it was copied correctly and was made about March, 1887. He took two books, that is, record book A, and the book into which marriage contracts were recorded, and from the latter obtained the few illegible words which had become partially erased in record book A. It was agreed between the parties, that W. H. Underwood died between the years 1856 and 1859. Evidence was also introduced, showing title from the State of Georgia to Reuben Cone to the land in question, the latter taking the title in the year 1838. Evidence was also introduced, tending to show that Judge Underwood lived in Atlanta, Fulton county, Georgia, from the date of his marriage to Mrs. Cone, and that he and his wife lived in said city until their death. A certified copy of the marriage license issued to Judge Underwood and Mrs. Cone by the ordinary of Fulton county, under date of December 5, 1854, together with a certificate of the pastor of the Presbyterian church in Atlanta, of the same date, that he had married the parties, were also introduced in evidence. After the introduction of this evidence, the plaintiff tendered a copy of the record of the marriage contract from book A of the records of Fulton county, Georgia, and, together with the same, the copy made by Anderson in 1887, to explain the illegible parts of the marriage contract as it at that time ap-

peared on the record.  To the introduction of these papers the defendants objected on several grounds.  Those necessary to be considered here are: (1) Because there was no proof made that there ever was a genuine original.  (2) Because the deed (contract) has never been recorded according to law; it should have been recorded in the county of Floyd, and the contract that has been attempted to be introduced in evidence was recorded in the county of Fulton.  (3) That the deed (contract) upon its face showed that it was made on the Sabbath day, to wit, Sunday, the 5th day of November, 1854.  These several grounds will be considered in their order.

1. Should the copy contract have been excluded because there was no sufficient proof of the existence of a genuine original?  We think not.  Certainly before secondary evidence, in the form of a copy from the record, of a paper required to be registered may be admitted in evidence, the existence of the original must be proved, as well as its destruction or loss.  A marriage contract, in order to be effective, is required to be registered under the laws of this State, and this court, in the case of *Eady* v. *Shivey*, 40 *Ga.* 684, held that "The existence, genuineness and contents of a deed shown to be lost or destroyed, may be proven by a certified copy of the record of it, if it has been properly and legally probated for record."  Under this established rule, which is founded on reason, and is the result of legal registration when such is required, we think that the existence and execution of the marriage contract were sufficiently shown to admit a proper copy as evidence.  The admission of secondary evidence is grounded on the necessity of the case, and can as a rule be admitted only when there is no stronger and better proof of the fact which is sought to be established.  Civil Code, § 5164.  And a certified copy from the registry of a paper properly registered, and which has been lost or destroyed, is deemed good secondary evidence.  Civil Code, § 5219.  Such copy from the registry, if duly recorded, shall be admitted in evidence, whenever the court is satisfied of the fact of the loss or destruction of the original; and of this the party may be a witness.  Civil Code, § 3630.  Mr. Greenleaf, in his work on Evidence (vol. 1, § 558), says that "the

party is required to give some evidence that such a paper once existed, though slight evidence is sufficient for this purpose, and that a bona fide and diligent search has been unsuccessfully made for it in the place where it was most likely to be found, if the nature of the case admits such proof"; and "that the object of the proof is merely to establish a reasonable presumption of the loss of the instrument, and that this is a preliminary inquiry addressed to the discretion of the judge"; also that if the document "is ancient, a less degree of diligence will be demanded, as it will be aided by the presumption of loss which the circumstances afford." In this case, the father of the plaintiff, who was one of the trustees named in the contract, was dead; the grandmother was dead. The mother of the plaintiff and her children were the beneficiaries named in the instrument. The evidence showed that the plaintiff had searched the papers of his father and of his grandmother, and had inquired of his mother and of those who he thought might have knowledge of it, and had made diligent search and was unable to find it. We think that this was such a compliance with the rule of law in relation to establishing the loss of the original, as was sufficient to admit in evidence a copy from the record, in the absence of any other objection. *Imboden* v. *Etowah Co.*, 70 *Ga.* 86.

2. A further objection was made to the introduction of a copy from the records of Fulton county, because it was insisted that the contract could only be properly recorded in the county of Floyd, and that a copy from the records of Fulton county would not, under any circumstances, be admissible. The contention of the defendant in error was, that under the law this marriage contract must have been recorded in the county of the residence of the husband; that the proof showed that the county of Floyd was the county of his residence at the time of the execution of the contract; and that the record of the instrument in Fulton county, not being a compliance with the registry laws of this State, was not such a record as would authorize the introduction of a copy from such record. As we have seen, where a written instrument is by the terms of law required to be recorded, a certified transcript of such record is

admissible in evidence in the event the original is lost or destroyed. The admission of this secondary evidence is a legal incident to registry, and the presumption is that public officers charged with the duty of registering such instruments have properly and faithfully performed such duty. If no provision is made for record, then no such presumption follows, and a copy of an instrument not required by law to be recorded, even when found upon the public records, carries with it no greater indicia of verity than any other copy. *Dill* v. *Strozier*, 32 *Ga.* 688; *Beverly* v. *Burke*, 9 *Ga.* 440; *Rushin* v. *Shields & Ball*, 11 *Ga.* 636. It follows that unless the record of the original was properly and lawfully made, a transcript from the record is not admissible. Where the registry is made in a county different from that in which the law requires it to be made, Mr. Devlin, in his work on Deeds, § 666, says, "the certificate of the public custodian of the record is entitled to no more respect than if the same had been performed by a private individual." It is hardly necessary to submit further authority for this proposition which our court has recognized in a number of cases; among them, *Chapman* v. *Floyd*, 68 *Ga.* 455; *Kennedy* v. *Harden*, 92 *Ga.* 230; *Bagley* v. *Kennedy*, 94 *Ga.* 351.

This brings us to the consideration of the main point under this branch of the case: was the marriage contract properly recorded in the county of Fulton? It will be remembered that it was executed one month prior to the solemnization of the marriage between the parties, and that the contract itself fixed the residence of W. H. Underwood, the prospective husband, in the county of Floyd. While we do not go to the extent of ruling that any estoppel was worked by this recital in the contract, because perhaps of immateriality to the subject-matter of the contract, it is nevertheless true that this recital in the contract is, between the parties thereto, prima facie evidence of the fact recited. 1 Greenl. Ev. §§ 23–26. There is no evidence in the record which overcomes the effect of this recital, and it should be accepted as one of the facts in the case, that at the date of the execution of the contract W. H. Underwood resided in the county of Floyd. There is evidence that from the date of and subsequent to the marriage, which oc-

curred on December 5, 1854, he resided continuously in the
county of Fulton.   The evidence of these two facts is entirely
consistent.   Under the provisions of the law of force at the
time of the execution of this contract, upon solemnization of
the marriage the marital rights of the husband attached to all
the real property owned and possessed by the wife, and such
came under his dominion and was subject to the payment of
his debts.   The object of the record of a marriage contract,.
which prevented this general rule of the common law from be-
coming applicable to the particular case, and preserved to the
wife the ownership and secured to her the benefits of such
property for her separate use, was to give to those who dealt or
contracted with the husband legal notice of the reserved rights
of the wife.   Section 2483 of the Civil Code requires that
" every marriage contract  .  .  must be recorded in the office
of the clerk of the superior court of the county of the residence
of the husband, within three months after the execution thereof.
On failure to comply with this provision, such contract  .  .
shall not be of any force or effect against a purchaser, or a
creditor, or a surety, who bona fide and without notice may be-
come such before the actual recording of the same."   The cod-
ification of this section was made from the act approved De-
cember 30, 1847, which was entitled "An act to require mar-
riage settlements to be recorded."   Prior to that time there
was no distinct statute requiring such record to be made, and to
obviate the evil which resulted this act provided, in the first
section, that all marriage agreements or settlements which had
before that time been executed within or without the State,
where the husband resided within the limits of this State,
should be recorded within twelve months after the passage of the
act.   Section 2 of the act provided that all marriage agree-
ments or settlements which might after its passage be made,
and where the husband resided in this State, should be recorded
within three months from the execution of such agreement or
settlement; and section 3 of the act provided that if such
record should not be made as required, the instrument should
not be of force against a bona fide purchaser, creditor, or surety,
who became such before the actual record of the same.   So it

will be seen that the object of this act, which was in force at the date of the execution of the marriage contract now under consideration, was to protect purchasers, creditors, and sureties of the husband ; and that by its provisions, in order to make such protection effectual, not only such contracts as were entered into subsequently to the passage of the act should be recorded, but those which had before that time been entered into by a husband who resided in this State should also be recorded.

It will be noted further that the language of the act required such record to be made in the county of the residence of the *husband.* Before the solemnization of the marriage, such contract could not have any force or vitality. Being founded upon the consideration of marriage, the terms became binding only when the marriage was accomplished. There was certainly no necessity, in order to carry out the provisions of the act, that a contract should be recorded, when by its terms it had no binding effect ; and hence it was required specifically that the record should be made in the county of the residence of the husband, evidently not intending to provide for any record of the instrument until the relation of husband and wife had been established between the parties. It is true that the words of the statute require the record of the instrument within three months from the date of its execution ; but as the instrument could have no binding effect in law until the marriage, it can not be taken that these words should be given their literal meaning, because, if recorded prior to the solemnization of the marriage, it could not be done in the residence of the *husband.* Evidently it was contemplated that the execution of marriage contracts generally would immediately precede the solemnization of the marriage ; and as far as our investigation has enabled us to determine, such is usually the case. It is not, however, necessary for us to make a formal ruling on this particular point, as it is not practically for determination here. These suggestions, however, are made as giving force to the line of reasoning which furnishes our conclusions on the question raised. As stated before, the contract recites the date of its execution to have been November 5, 1854. It was given vitality by the solemnization of the marriage, December 5, 1854. It is shown by the evidence that

from the latter date W. H. Underwood resided in Fulton county, and the record was made in Fulton county on December 7, two days after the marriage. It thus appears that, within three months after the execution of the contract, it was recorded in the county of the husband's residence; and there was, we think, not only a substantial, but a literal compliance with the law as to the registry of this contract. If the object of the record be as stated above, then that object has been accomplished by this record, and it would not have been accomplished by a record in the county of Floyd; and it is our judgment that, under the facts of this case as they appear in the record, the registry of this instrument was properly made in Fulton county.

3. The question which is next to be considered is, whether the contract, having been executed on Sunday, is illegal and of no binding force because of that fact. It was admitted that November 5, 1854, fell on Sunday. At common law, contracts made on Sunday were not invalid. 22 Am. & Eng. Enc. L. 555, and authorities cited. In 2 Parsons on Contracts, 757, note, it is said: "But as to the making of contracts and all other acts not judicial, the common law made no distinction between Sunday and any other day." In Bishop on Contracts, 537, the author in treating of this subject uses the following language: "The statutes constitute the sole basis of the invalidity of Sunday contracts." By an act approved February 25, 1784, the General Assembly of Georgia adopted and continued in force "all and singular the several acts, clauses and parts of acts that were in force and binding on the inhabitants of said Province [Georgia] on the 14th day of May, 1776, so far as they are not contrary to the constitution" etc. of this State; also "the common laws of England and such of the statute laws as were usually in force in the said Province, not contrary to our constitution," etc. Prince's Digest, 570. It will be observed that the purpose of this act was not only to adopt the common law and statute law of England suitable to our condition, but also the laws passed by the colonial congress. Among the acts thus adopted and put in force by this act was one approved March 4, 1762, passed by that congress. It was entitled "an act for preventing and punishing vice, profane-

ness and immorality, and for keeping holy the Lord's day, commonly called Sunday." Section 2 of that act is as follows: "No tradesman, artificer, workman, laborer, or other person whatsoever, shall do or exercise any worldly labor, business, or work of their ordinary callings, upon the Lord's day, or any part thereof (works of necessity or charity only excepted), and that every person being of the age of fifteen years or upwards, offending in the premises, shall for every such offense forfeit the sum of ten shillings." Cobb's Dig. 853. This act is the foundation of the section of our code which bears on the subject, and, with the exception of changing the punishment, the words of this original act were codified in section 4451 of the Code of Georgia of 1863; and in section 4493 of the Revised Code of 1868; and in section 4579 of the Revised Code of 1873; and in the same numbered section as the latter in the Code of 1882. So that, up to the adoption of the present code, the law of Georgia in relation to Sunday work and contracts was taken in words from the statute of 1762. The language of the statute has been changed in the codification of 1895, and section 422 of the Penal Code now is as follows: "Any person who shall pursue his business, or the work of his ordinary calling, on the Lord's day, works of necessity or charity only excepted, shall be guilty of a misdemeanor." This is the section of the code which affects the validity of contracts entered into on the Sabbath day. It will be seen that, as it is simplified, it applies solely and exclusively to a prohibition against the pursuit of one's business or the work of his ordinary calling on Sunday, works of necessity or charity only excepted. It is true that this is a penal statute and provides a punishment for its infraction. But it is more than this; its effect is to declare illegal all contracts made on Sunday which are in the work of one's ordinary calling, or in the pursuit of his business; and so having been made illegal, such contracts have no validity in law.

This is the history of our statute law on this subject. As we have before seen, there was no inhibition as to the making of contracts on Sunday by the common law; and whether the contract now under consideration was valid or invalid from

the fact of its execution on Sunday, must be determined by the statutes in force. The English statute, 29 Car. 2, c. 7, s. 1, from which the statute of 1762 was taken, is in the following words: "That all and every person and persons whatsoever shall, on every Lord's day, apply themselves to the observation of the same by exercising themselves thereon in the duties of piety and true religion, publicly and privately; and that no tradesman, artificer, workman, labourer or other person whatsoever shall do or exercise any worldly labour, business, or work of their ordinary calling upon the Lord's day, or any part thereof (work of necessity and charity only excepted), and that every person being of the age of fourteen years or upwards, offending in the premises, shall, for every such offence, forfeit the sum of five shillings." 14 English Common Law R. 269. We thus perceive that the statute in force in Georgia, by which the validity of this contract is to be determined, is precisely similar to the English statute. The latter has been repeatedly passed upon by the English courts; and while the adjudications made by them are not absolutely binding on this court, because such construction was made subsequently to our adoption of the statute, they are yet authority which this or any other court may consult with profit. The first English case which we have found reported is that of Drury v. Defontaine, 1 Taunt. 131, in which Chief Justice Mansfield presided and construed the words of the statute. In that case he pronounced the rule to be, that unless the labor, business, or work done was within "the ordinary callings" of one or the other of the parties, the statute did not apply; and it was there held that where it appeared that a party selling a horse was an auctioneer and was engaged in the business of selling at public sale, a private sale on Sunday of a horse sent to him to be sold was not illegal. This decision was rendered in the year 1808. In Bloxsome v. Williams, 3 B. & C. side page 232, Bayley, J., delivering the opinion of the court, refers to the case of Drury v. Defontaine, supra, and says: "I entirely concur in that decision, but I entertain some doubts whether the statute applies at all to a bargain of this description. I incline to think that it applies to manual labor and other work visibly laborious,

and the keeping open of shops"; and the ruling in the case was, that where one of the parties was in ignorance of the fact that the other party was "exercising his ordinary calling on Sunday," a suit would lie at the instance of the former for breach of warranty in the sale of a horse, notwithstanding the horse-trader himself had violated the statute. This decision was rendered in 1824. In the case of Fennell v. Riddler, 5 B. & C. side page 406, the construction which Chief Justice Mansfield had given the statute in the Drury case, supra, was adhered to; but it was held that a horse-dealer could not maintain an action upon a contract for the sale and warranty of a horse made by him upon a Sunday.

In Rex v. Inhabitants of Whitmarsh, 7 B. & C. 596, Bayley, J., in construing the statute, and after quoting the words of the same, says: "Now, if the legislature had intended to embrace every description of persons and every species of business, it would not have been necessary to make an enumeration of several classes of persons exercising particular descriptions of labor or business. It would have been sufficient to say that no person whatever should do any work or business on the Lord's day. If the enactment had intended to be general, the legislature would have used general words. It has been argued that the words, 'worldly labor, work, or business of their ordinary callings,' are to be construed disjunctively. The true construction of the clause appears to me to be, that the persons there mentioned shall not on the Lord's day do or exercise any labor of their ordinary calling, any business of their ordinary calling, or any work of their ordinary calling." In pursuance of this construction, that eminent judge held that a contract of hiring made on a Sunday, between a farmer and a laborer for a year, was valid. This decision was rendered in 1827. In Smith v. Sparrow, 4 Bing. side page 84, a contract entered into with a broker on Sunday for the purchase of nutmegs was held invalid. In that case Parke, J., in his concurring opinion, says: "I do not think this court was right in the decision of Drury v. Defontaine. I think the construction put upon the statute in that case too narrow. The expression 'any worldly labor' can not be confined to a man's ordinary calling, but applies to any

business he may carry on, whether in his ordinary calling or not." This opinion was rendered in 1827. In Scarfe *v.* Morgan, 4 M. & W. 270, the construction given to the statute by Chief Justice Mansfield was again adhered to. This last decision was made in 1838.

We have not deemed it profitable to pursue our investigation of the decisions of the English .courts further than the above cases. Having shown the identity of the Georgia and English statute, it accomplishes our purpose to have shown the construction which the courts in England gave the statute to the time, approximately, when this court was called on to construe the Georgia statute. The first case in which this court construed the statute is that of *Sanders* v. *Johnson,* 29 *Ga.* 526, decided at the November term, 1859, where it appeared that the note which was sued on in that case was made and signed on Sunday; and, as a remarkable coincidence, on the same Sunday as the one on which this contract purports to have been executed, viz. November 5, 1854. In that case the court was requested to charge the jury that if the note was made and executed on the Sabbath, the Lord's day, they should find for the defendant, as notes made and executed on that day are void, unless the same be for works of necessity or charity. This request the court refused, and charged the jury that the defendant by signing the note admits its consideration to be good, and that the note before them was legal and collectible. In delivering the opinion of the court in that case, Benning, Judge, says: "If the note was given otherwise than in the exercise of any worldly labor, business, or work of the ordinary callings of the parties to it, the note, though made on Sunday, was not within the act of 1762 (Cobb, 853), and therefore was not rendered void by that act. . . It does not appear from the evidence that the note was made by the parties to it in the exercise of worldly labor, business, or work, of their ordinary callings, and the onus was upon the defendant to show that it was." The judgment for the amount of the note in favor of the plaintiff was affirmed. The case of *Dennis* v. *Sharman,* 31 *Ga.* 607, while apparently questioning the soundness of the ruling in *Sanders* v. *Johnson,* supra, also rules expressly that

the adjudication of the question then under consideration was not involved in the ruling made in that case (see page 618).

The next case is that of *Hill* v. *Wilker*, 41 *Ga.* 449. The whole tenor of the reasoning of Chief Justice Lochrane in this case and the authorities cited by him are against the validity of Sunday contracts. The decision of the case, however, is based upon the construction given the statute by Benning, Judge, in the case of *Sanders* v. *Johnson*, supra, and the opinion concludes with these words: "And as our courts have held all contracts made in the pursuance of the ordinary callings or business on the Lord's day, or Christian Sabbath, to be void, it follows that this court so adjudges in the case at bar, and the judgment of the court below is, *on this ground*, reversed."

In *Meriwether* v. *Smith*, 44 *Ga.* 541, it was ruled that when a contract for labor was entered into on the Sabbath, and the contract was performed afterwards by the laborer, the promisor can not defend by setting forth the illegality of the contract. It is fair to say that in this case the decision was not put upon the construction of the statute. Inasmuch as the facts of the case show that the contract was entered into between the owner of farm lands and a tenant and was for the rent of land, the making of the contract must have been within the ordinary calling of one or both of the parties. In the case of *Morgan* v. *Bailey*, 59 *Ga.* 683, Warner, Chief Justice, quoted the statute and ruled that "The defendant was a farmer, and it was a part of his ordinary business and calling to purchase land and pay for it in order that he might pursue his ordinary business and calling as a farmer"; and that, this being so, the note executed as a consideration for the purchase of land was illegal. In the case of *Ball* v. *Powers*, 62 *Ga.* 757, it was held that a negotiable paper, drawn, accepted and delivered on Sunday, is void between the parties; and in the course of the reasoning in his opinion, Bleckley, J., says: "Sunday is not a day for conducting trade in its due course, and dealing upon that day in negotiable paper in ordinary business, so far from being favored, is a breach of the penal laws." In the case of *Sawyer* v. *Cargile*, 72 *Ga.* 290, where it was held that the publication of the advertisement of a marshal's sale for taxes in a newspaper appear-

ing on Sunday was not legal and that no title passed, it was further ruled that "Sunday is *dies non juridicus*, and service can not be made, or legal notice given on that day, or the business or work of ordinary callings done." In another case in the 62 *Ga.* 449, *Weldon* v. *Colquitt*, in which the reasoning is strongly pro-sabbatic, Justice Bleckley recognizes the uniform construction placed upon the statute in very clear and explicit terms, in which he declares that in strict law, where a magistrate in disregard of the legal restraints appertaining to the Sabbath, and in the absence of any necessity, engaged in the exercise of judicial functions on that day, such officer himself was amenable to the penalties of our code as a violator of the Sabbath, "the holding of courts of inquiry being a part of his ordinary calling as a judicial officer." The same construction of the statute is also recognized in the case of *Rothschild* v. *City of Darien*, 69 *Ga.* 503 ; and also in the case of *Harrison* v. *Powers*, 76 *Ga.* 218.

In the case of *Calhoun* v. *Phillips*, 87 *Ga.* 482, it is declared in broad terms that a contract of sale made on Sunday, with no delivery of the property then or afterwards, is void although the parties intended to waive delivery. In the opinion, Mr. Justice Simmons, in declaring the contract made in that case illegal and void, refers to the statute of this State as it was then contained in section 4579 of the Code of 1882; and while the general proposition is ruled that because the contract was made on Sunday it was void, an examination as to the terms of the contract shows that it was made in the ordinary callings of the parties. In the case of *Hennington* v. *State*, 90 *Ga.* 399, Chief Justice Bleckley, referring to the statute, says: "The statute can fairly and rationally be treated as a legitimate police regulation, and thus treated, it is a valid law. There is a wide difference between keeping a day holy as a religious observance, and merely forbearing to labor on that day in one's ordinary vocation or business pursuit." And in the case of *Western Union Telegraph Co.* v. *Hutcheson*, 91 *Ga.* 252, the same eminent jurist, referring to the case then under consideration says: "There is no good reason to doubt that the prohibition of section 4579 of the Code, upon ordinary Sunday labor, applies no

less to telegraph companies and their employees, than to other persons." In the case of *Keck* v. *City of Gainesville*, 98 *Ga.* 423, a construction of the statute is given practically the same as that in the case of *Sanders* v. *Johnson*, 29 *Ga.* 526. Chief Justice Simmons, in delivering the opinion, says, the statute above referred to "is ample to protect the public from the carrying on by any person of the work of his ordinary calling on Sunday, whatever may be his religious belief. It is a police regulation which the State has a right to adopt; and its purpose is not to force people to observe Sunday, in a religious way, or according to the religious views of any portion of the community, but to require that it be observed as a day of rest and cessation from labor, the legislature doubtless regarding this as necessary to the health and well-being of the people. The legislature could have appointed Monday for this purpose as well as it did Sunday, and the law would have been equally binding."

We have referred to these decisions of our own court for the purpose of showing that the construction which we give to the statute in the present case has been uniformly recognized from the decision in the case of *Sanders* v. *Johnson*, 29 *Ga.* 526, up to this date; and while these cases, not including that appearing in the 29 *Ga.*, are not express adjudications of the point at issue, they are cited as showing that no construction of our statute contrary to the doctrine of that case has been made. We are aware that there are some English decisions holding to the contrary of those which we have cited. We are also aware of the fact that in a number of other States similar statutes have been so construed as to render contracts executed on Sunday illegal, depending largely in the latter case on the words of such statutes. But when we find a strong current of decisions by learned judges of the English courts construing the terms of their statute which is exactly similar to ours, and a recognition of such construction uniformly made through a great number of years by this court, without any express contrary ruling, we are bound to accept such construction as the law of the land. In this case it can not be said that a marriage contract is in the exercise of the ordinary business or calling of either of the

parties thereto; and this being true, we conclude that the execution of an instrument of this character is not rendered illegal by having been made on Sunday. The question of the prohibition of work of any character on the Sabbath day, or the execution of contracts on that day, is entirely within the province of the legislature. But as we have seen, the statute which has stood on our books for more than a century does not render such contracts illegal in this State; and until the General Assembly shall change its terms or make new provisions regarding the Sabbath day, the work, labor and business prohibited is that done in pursuance of one's ordinary calling.

On the argument here, the case of *Sanders* v. *Johnson*, 29 *Ga.* 526, was asked to be reviewed, and permission granted. For the reasons above given, and after due consideration, we decline to overrule the construction given to our statute in that case, but adhere to the doctrine there announced, as the proper construction to be given the statute. It follows, that the judgment of the court below in excluding the copy contract as evidence for consideration by the jury, on the ground that it was illegal because executed on Sunday, was erroneous; and accordingly the same must be      *Reversed.  All the Justices concurring.*